**AFFIRM; and Opinion Filed April 21, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-15-01294-CV

## IN THE INTEREST OF K.S., A CHILD

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JD-14-01199-W**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Brown, and Schenck
Opinion by Justice Brown

In this accelerated appeal, Mother appeals the trial court's decree of termination, terminating her parental rights to her son K.S. following a jury trial. Mother raises three issues on appeal challenging the legal and factual sufficiency of the evidence to support the jury's findings. For reasons that follow, we affirm the trial court's decree of termination.

### GENERAL BACKGROUND

K.S. was born in October 2010 to Mother and Father. In October 2014, when K.S. was four years' old, the Texas Department of Family and Protective Services filed an original petition for protection of K.S., for conservatorship and for termination in a suit affecting the parent-child relationship. The trial court appointed the Department temporary managing conservator of K.S. The Department asked to be appointed K.S.'s sole managing conservator if K.S. could not safely be reunified with either parent or permanently placed with a relative or other suitable person.

The Department further asked the trial court to terminate Mother's and Father's parental rights to K.S. if reunification could not be achieved.

The case originated due to Mother's October 23, 2014 arrest for shoplifting at a Walmart.[1]  K.S. was with her at the time.  The arresting officer asked Mother for the name of someone who could take care of K.S. while she was taken to jail.  Mother first named Father, but police determined he was a registered sex offender and would not release the child to him.  Mother then gave the name of her adult son.  The officer spoke to him on the phone twice, and he indicated he would come get K.S., but he never arrived.  The officer took K.S. to Child Protective Services and took Mother to jail.  K.S. was placed in a foster home the next day.  He was nonverbal, and it was apparent he was developmentally delayed and possibly autistic.

While K.S. was in foster care, he was diagnosed with autism spectrum disorder with accompanying language impairment.  On December 24, 2014, at Mother's request, K.S. was placed with LaDonna Norman, a friend of Mother's.  K.S. began speech and occupational therapy sessions at Norman's house.

CPS prepared a family service plan which required Mother to complete various tasks and services to regain custody of K.S.  In December 2015, the trial court incorporated these requirements into a temporary order.  The case proceeded to a jury trial in September 2015, eleven months after Mother's arrest.

The jury found that Mother had knowingly placed or knowingly allowed K.S. to remain in conditions or surroundings which endangered his physical or emotional well-being.  The jury also found that Mother had engaged in conduct or knowingly placed K.S. with persons who engaged in conduct which endangered his physical or emotional well-being.  The jury further

---

[1] There was one prior referral, made in the summer of 2014, regarding Mother and Father.  The referral alleged neglectful supervision and physical neglect.  The referral stated that a neighbor had heard K.S. fall down the steps at home and EMTs were not called.  CPS investigated and learned that EMTs had been called.  CPS ruled out physical neglect and did not find sufficient evidence of neglectful supervision.

found that it was in the best interest of K.S. to terminate the parent-child relationship between him and Mother. In accordance with the verdict, the trial court terminated Mother's parental rights to K.S.

Father had answered, but did not appear at trial. The jury found that it was in K.S.'s best interests to terminate Father's parental rights, and the court's decree did so. Father is not a party to this appeal.

**THE STATE'S WITNESSES**

*Mother*

Mother has three sons, K.S., Corey, who is twenty-five years' old, and B.S., a twelve-year-old who lives with his father in Greenville. She testified she was caught shoplifting at Walmart, but indicated it was an accident. She had placed hair products on her diaper bag in the bottom of K.S.'s stroller, and the items fell into the bag because K.S. was throwing a fit. Mother pleaded no contest and got deferred adjudication.

In February of 2008, Mother was diagnosed with cancer. Her cancer treatment ended in September 2008, and at the time of trial she was in remission. She has to have scans every year and blood work every three months. Mother testified she makes it to those appointments. Mother testified that in 2009 she was diagnosed with bipolar disorder and depression. She took medication for a short time.

In November 2008, Mother lived at Dallas Life Foundation, a shelter for people with drug or alcohol issues. Mother met K.S.'s Father while she was living there. Sometime after that she lived at the Salvation Army and then went into a program at the Housing Crisis Center. When K.S. was born in 2010, Mother lived in an apartment. She moved at least three times before her arrest for shoplifting. At the time of her arrest, Mother lived on Nogales, but she was evicted for nonpayment of rent in July 2015. After that, she lived with a friend named Stephanie

whose last name she did not know. When trial began, Mother was staying with another friend, but had been approved for an apartment. She needed money to pay the rent before she could move in.

Mother testified she receives supplemental social security income due to bipolar and cancer. A month prior to trial, Mother began working in home health care twelve–and–a–half hours a week. Mother testified she has an associate's degree in accounting. She last worked in accounting in 2007, but stopped because of her cancer diagnosis.

Mother testified about K.S.'s medical care when he was in her custody. She testified he had all of his vaccinations except for those given at four years of age. When asked if she took K.S. for hearing and speech screenings his pediatrician Dr. Favroth recommended, Mother testified she made "all but one" of those appointments because she was incarcerated and sick. The State asked Mother if she had told the pediatrician she did not go to the hearing screening because she lost the referral. Mother replied, "No." She testified that Dr. Favroth notified her she had lost the referral because "they were sick." Mother also testified she made an appointment and took K.S. to a screening. She indicated K.S. had seen at least two doctors for a screening, both at Children's Medical Center and at a location in Richardson. Mother testified that documentation of those visits was in storage.

Mother stated she did not want to see that anything was wrong with K.S. She said she did not notice anything unusual about his behavior other than his speech. He had a hard time speaking.

K.S. was living with LaDonna Norman at the time of trial. Mother proposed he be placed there. At that time, Mother and Norman had been friends for about a year.

Mother's caseworker Brian Lockett discussed with her the importance of her attending K.S.'s medical and therapy appointments. Mother testified she had been to a dental appointment

for K.S. and to a handful of doctors' appointments. K.S.'s therapy appointments were held at Norman's house twice a week on Tuesdays and Thursdays. Mother testified she attended three therapy appointments. She testified about the problems she had attending those appointments. First, she had required parenting and domestic violence counseling classes on the same days. She finished parenting classes in April 2015, and was still in domestic violence counseling on Tuesdays. Mother testified she had a good relationship with her therapist, but Mother could not recall whether she had asked the therapist about moving the appointment time in order to be with K.S. Transportation was also a problem for Mother. Norman's home is a mile from the bus route. In addition, the timing of the bus was problematic. Mother stated the appointments were "anywhere from . . . 11 a.m. and whenever he gets out of school." The first bus got her to De Soto where Norman lived at 7:30 in the morning, but the next bus was too late. Mother also testified that her relationship with Norman deteriorated in the last few months, and they were not on "good speaking terms." Additionally, Norman never asked her to come to the appointments. Norman told Mother the therapist said she was a distraction. Mother also indicated she was unsure of the time of the therapy sessions because K.S.'s school schedule had changed. She asked her caseworker for the appointment times, but never got a response from him.

Mother visited K.S. at Norman's house. The visits could be as often as they agreed to meet. Norman initially picked Mother up for the visits. At some point, due to the issues that arose between Mother and Norman, the visits moved to a McDonald's and occurred once a week. After Mother and Norman had a disagreement at McDonald's, the visits moved to CPS offices. The disagreement was over K.S.'s eating. Norman objected to K.S. eating Mother's french fries. Norman had discussed with Mother that certain foods caused K.S. severe constipation. Mother testified she had been fairly diligent in not giving him those foods. The CPS visits occurred weekly and were one-hour long. Mother testified that during these visits,

she and K.S. worked on his ABCs, sang, talked, prayed, and ate. Mother stated she spent all of the time she had with K.S. totally focused on him.

*LaDonna Norman*

LaDonna Norman, who works in her home as a tax preparer, testified that K.S. has lived with her since December 24, 2014. Norman met Mother through a mutual friend and considered her a good friend at that time. Norman knew K.S. could not talk and believed he had developmental delays. He also was not potty trained. Norman had discussed K.S.'s delays with Mother, as well as Norman's concerns Mother was not taking adequate care of K.S. Mother did not seem concerned about the delays. Mother did tell Norman she was going to take K.S. to a speech therapist. But, as far as Norman knew, Mother had not done so.

Norman testified K.S. had begun speech therapy and occupational therapy in her care and was getting ready to start behavioral therapy. She testified that in the time he had been living with her, K.S. had made progress. He had learned to eat with silverware, change his clothes, brush his teeth by himself, use crayons to color, and make a few sounds.

At first Mother visited K.S. in Norman's home. Norman initially picked her up from the train station "[p]robably more than a mile" from Norman's house. Norman eventually stopped picking Mother up because Norman thought she was more concerned about Mother making her visits than Mother was herself. At some point, probably in March 2015, they moved the visits to a McDonald's, which was about half a block from the train station. They met there until the end of June. At that time Norman informed Mother the visits needed to take place somewhere else because Mother was not listening to what Norman was telling her about K.S.'s problems with constipation. A medical professional had told Norman K.S. needed more fiber and was supposed to stay away from french fries because they caused him painful constipation.

Norman had concerns about how Mother interacted with K.S. during the visits she observed. Mother was on her cell phone instead of visiting with K.S., or Mother gave K.S. the phone to use instead of spending time with him. K.S. used the phone to watch Elmo.

Norman testified she kept Mother informed about all but two of K.S.'s doctors' appointments. Norman also told Mother when the therapy appointments were. They began in January 2015, and occurred every Tuesday and Thursday at Norman's house. The time of day changed when K.S. started school, but the days of the week remained the same. Both the speech and occupational therapist had encouraged Mother to come to the therapy sessions. Norman had encouraged Mother to come. Norman had never told Mother not to come to those appointments or heard anyone tell Mother she should not come. Norman testified Mother came to two occupational therapy sessions and had never been to a speech therapy appointment. There were eight therapy sessions a month. Mother told Norman she did not come to the appointments because she needed a ride and because of the conflict between her and Norman. Norman had heard Mother's caseworker tell Mother it was important for her to be at the appointments to learn what was going on with K.S. if he was going to be returned to her. Mother went with Norman to one dentist appointment for K.S. She also went to one medical appointment three weeks prior to trial and an appointment to enroll K.S. in school. Mother told Norman she was not going to K.S.'s medical appointments because the court had not ordered her to do so.

*Cynthia Zavala*

Cynthia Zavala, an investigator for CPS, met K.S. shortly after Mother's arrest. Zavala had concerns about him — he was still in diapers, he walked on his "tippy toes" at all times, he was not verbal, and she was not sure he could hear. Zavala suspected abuse or neglect and arranged for K.S. to be evaluated at the REACH clinic at Children's Medical Center. Zavala interviewed Mother in jail. Mother told Zavala she was looking for an audiologist for K.S.

Zavala later observed two visits between Mother and K.S. They appeared bonded, and Mother sat and played with K.S. Mother told Zavala they were working on learning sign language. It appeared that K.S. knew the alphabet.

*Dr. Charles Gagnon*

Dr. Charles Gagnon has a doctorate in counseling psychology. At the request of CPS, he saw Mother in July 2015 for a psychiatric evaluation and interviewed her for one hour. Mother told him she was diagnosed with bipolar disorder in 2008 and reported that she had taken medication for the condition but stopped taking it because it made her feel sedated. During the interview, the doctor did not see any behavior to warrant a diagnosis of bipolar. Mother exhibited a little bit of depression "commensurate with the situation."

*Dr. Anu Partap*

Dr. Anu Partap is a pediatrician who runs the foster care clinic at Children's Medical Center. She saw K.S. for a new patient appointment in November 2014 and for one follow-up appointment. She testified he was "profoundly delayed for his age," socially, emotionally, and developmentally. He did not walk the way one would expect a four–year–old to walk. His "gait abnormalities" caused him to walk a little off balance. Dr. Partap's primary concern was that K.S. did not speak. He was also very abnormal in how he related to people. She stated he had a "restless and chaotic way of existing in the exam room." He had a significant developmental delay or disability that needed diagnosis and treatment. The doctor testified K.S.'s behavior was so outside the norm that even a layperson would have noticed something was wrong. She hoped another pediatrician who had seen the child in the six months before would have noticed something was amiss. When she saw K.S. at his follow–up appointment, he had begun receiving interventions and treatment. She expected he would need about six different treatments: speech therapy, a hearing evaluation, a physical therapy assessment and possible treatment, occupational

therapy, parent training, and behavior intervention. Dr. Partap testified it was important for the parent of a child receiving these different therapies to be present during treatment. Some of these therapies are based on training caregivers to know how to raise a child "24–7."

*Dr. Daphne Favroth*

Dr. Daphne Favroth is an internist who treated Mother and all three of her sons. She testified she last saw K.S. on June 5, 2012, for an eighteen-month checkup. He had also been in the office after that date for nurse visits. When the doctor saw K.S. in 2012, his speech development was an issue. He was not saying words. Mother brought that topic up with the doctor. Dr. Favroth wanted to make sure K.S. did not have a hearing problem as he had a history of ear infections. Dr. Favroth referred Mother to an audiologist. She did not know whether Mother followed up on the referral. Dr. Favroth explained the referral process. Her staff would fill out the necessary paperwork and fax it to Children's Hospital. Children's would fax back a response. Favroth's staff would give the telephone number to the parent and also let the parent know that Children's would usually contact her. If Mother had lost the information about the referral, she could have called Dr. Favroth's office and gotten the telephone number. Mother did not bring K.S. in for his 30- and 36-month checkups. Favroth testified that if she had seen K.S. at those checkups and he was not potty training, was not talking, and had an unusual gait, she would definitely have put more emphasis on getting him evaluated.

On cross-examination, Mother's attorney showed Dr. Favroth medical records indicating K.S. had been seen in her office on July 27, 2013, July 29, 2013, January 16, 2014, April 7, 2014, and June 11, 2014. Dr. Favroth testified she had been in error when she said the last time K.S. had been to her office was in 2012. She explained there must have been two sets of electronic medical records. Dr. Favroth stated the appointment dates showed Mother consistently brought K.S. into the office for treatment. K.S.'s medical records from a July 2013

–9–

visit mention speech therapy and hearing testing. January 2014 records show the doctor referred K.S. to an audiologist to assess his hearing and also to a speech therapist. Records from the April 2014 visit indicate that Mother had requested another referral to the audiologist because she lost the phone number. Notes from the June 2014 visit indicate K.S. presented with a sore throat and was scheduled for a hearing test. At that visit, Mother indicated concern about the delay in speech. Dr. Favroth testified that if Mother had taken K.S. for a hearing test at Children's, Children's would have faxed the results to her office. Dr. Favroth did not have a record of a hearing test, but said it would be possible to have other records at her office.

Dr. Favroth testified that Mother was trying hard to raise her child. She stated Mother "aggressively tried to help this child develop along like any other responsible mom." Mother was always cooperative, and Mother and K.S. appeared bonded. The doctor had no concerns about K.S.'s eating and said he did not have digestion problems. Dr. Favroth testified that potty training can be very difficult with an autistic child. Dr. Favroth never had any concerns Mother was neglecting or abusing her child. K.S. was up to date on his shots and needed only his four–year shots for school.

Dr. Favroth emphasized to Mother the importance of having the hearing test done. When asked if she saw any signs of autism or other type of developmental disability in K.S., Dr. Favroth said no. She stated she tried to keep autism "off the table" because it was a devastating diagnosis. She wanted to first make sure K.S. could hear. Dr. Favroth testified that not having a child tested for developmental delays and possible disability could be considered medical neglect.

*Peggy August*

Dr. Peggy August, a psychologist who does evaluations for CPS, performed a psychological evaluation of Mother in January 2015. The evaluation included a clinical

interview, a personality assessment inventory, and an evaluation of parenting stress. After the evaluation, Dr. August recommended parenting classes, random drug testing, a drug assessment, individual therapy, evaluation of Mother's psychiatric medication, and follow up with a medical care provider. Dr. August did not know whether Mother followed through on these recommendations. Dr. August stated her assessment was based in part on information provided by Mother and, if there were shortcomings in the information she provided, it might affect Dr. August's recommendations. Mother informed Dr. August she had been treated for bipolar disorder in 2008 or 2009. The doctor testified that based some test results, Mother had symptoms consistent with bipolar disorder. Mother reported that the shoplifting incident had been an accident. Mother reported experiencing anxiety and distress over being separated from her son. In her evaluation, Dr. August did not indicate any concerns about reuniting Mother with K.S. She also testified that Mother presented in a way that suggested she feels comfortable with herself the way she is and did not see cause for making significant changes in her life. But Dr. August also stated Mother was committed to doing whatever she needed to do to be reunited with K.S. Dr. August stated that if Mother failed to be present and make every effort to be present at her child's therapies, her commitment would be questionable.

*Dr. Toni Hill*

Dr. Toni Hill is a psychologist who saw K.S. for a developmental evaluation on November 11, 2014, shortly after Mother's arrest. Dr. Hill observed K.S. in his foster home. She watched how K.S. interacted in the home environment and with his foster mother, and how he responded to Hill herself. She also interviewed his foster mother and completed an adaptive behavior assessment measure. Dr. Hill diagnosed K.S. with "autism spectrum disorder with accompanying language impairment as well as child neglect." The doctor noted K.S. had some difficulties with social skills in addition to not being able to verbalize and communicate

effectively. She noted in her report that due to the lack of complete history on K.S. it was difficult to determine "what all was contributing to the issues that [she] noted during the assessment." Thus, it was imperative that he have ongoing treatment and the diagnosis continue to be refined as needed. The doctor explained autism spectrum disorder as a set of symptoms in people who have difficulty communicating, both receiving communication cues from others and knowing how to respond. In addition, it includes having some stereotypical behaviors such as repetitive movements that do not seem to serve an identifiable purpose. The name of this disorder is autism spectrum disorder because the symptoms can vary. One child or person can show more autistic behaviors and signs than another; there is a continuum of fewer symptoms to more symptoms. When asked where K.S. fell on the spectrum, Dr. Hill stated he was "more symptomatic in the sense of him not being able to express any intelligible words." The doctor stated K.S. needed "total self care."

The doctor also described K.S.'s language disorder. She testified that none of his words were intelligible; in other words, he did not verbalize any words she could clearly understand. Dr. Hill indicated K.S. was not close to being verbal. He hummed and made the "mmm sound" almost the entire time she observed and interacted with him.

K.S. flapped his hands in the air which did not seem to be related to a direct response from anything in the environment. He was delayed in his ability to feed himself and take care of a lot of his daily functioning needs. In addition to the issues K.S. had with responding to his environment, relating to others, and communication, K.S. had difficulties with gross and fine motor skills. Due to his lack of verbal ability and poor attention span, the doctor was unable to give him an intellectual assessment.

During Hill's interview with the foster mother, the foster mother mentioned K.S. liked having an alphabet book read to him. K.S. retrieved the book and opened it up to have his foster

–12–

mother read it to him. According to Dr. Hill, this behavior showed he had a propensity to learn, that he enjoys that type of stimulation, and likely enjoyed the closeness of being next to someone. The doctor testified that, because K.S. liked having a book read to him, it seemed K.S. had been read to in the past. When asked if K.S. showed positive emotions when being read to, the doctor responded that his affect and facial features really did not change, but it appeared he enjoyed the book because he wanted to read it again and again.

Dr. Hill made various recommendations for K.S.'s treatment and care. She recommended he have increased stability and consistency regarding his home environment as well as caregivers. She also recommended K.S. have clear direction as to what is expected of him and, when he is engaging in activities he should not engage in, that he have clear consequences and be redirected and provided with a more appropriate behavior. Dr. Hill recommended that K.S. be evaluated for occupational therapy, speech therapy, and physical therapy. The doctor recommended K.S. complete an evaluation with the local school district to determine if K.S. may qualify for and benefit from being in a specialized education program.

Dr. Hill testified that, in general, autistic children have a better outcome the earlier the interventions are started. Dr. Hill also stated that, generally speaking, it is recommended that any caregiver who will be involved with the child on a daily basis attend most of the therapy sessions so she has a clear understanding of how to carry out the skills and cue him to engage in the techniques learned during the course of the therapies. Given the level of K.S.'s needs, taking care of him was a full-time commitment, and K.S. would have a much better prognosis with a caregiver who was consistent in putting forth the effort to engage in activities and therapies with him. Dr. Hill stated that frequent relocations are not conducive to the progress of any child, but especially a child with autism spectrum disorder. Such a child thrives and does much better with consistency and stability.

*Nicole Diaz*

Nicole Diaz works for CASA, Court Appointed Special Advocates, an agency of volunteers and staff who are appointed to advocate for a child who has been removed due to abuse or neglect. Diaz's duties included monitoring K.S.'s progress while in the custody of CPS. Diaz visited K.S. at least once a month and monitored his parents' progress in completing court–ordered services. Diaz observed visits between Mother and K.S., observed K.S. in his home environment with Norman, attended court hearings, and attended the majority of K.S.'s therapy sessions. Diaz recommended that K.S. not be returned to Mother. Diaz described K.S.'s behavior when he first came into CPS care. According to her, one could easily tell without any special training that K.S. was a unique child. She said the changes in his behavior since he had been living with Norman were pretty extraordinary. Diaz stated that CASA has many concerns for K.S.'s safety, the main concerns being that Mother did not successfully complete court–ordered services and tested positive for illegal substances. When asked what Mother failed to do that she should have done, Diaz replied that she would have liked to see that Mother was getting ongoing treatment for the bipolar disorder she had disclosed or that Mother had clearance from a psychiatrist. Diaz also testified that because Mother tested positive for drugs over the summer, she should have been evaluated for substance abuse or addiction needs.

From October 2014 to late August 2015, Mother had not held a job. Diaz visited Mother twice over the summer before trial at Mother's apartment. Mother did not mention to Diaz that she was about to be evicted. Mother told Diaz she lived alone, but it did not appear to Diaz that was true. Mother's older son Corey and his adult male friend were there multiple times when Diaz visited. Also, there were "boy video games, rated R . . . death and killing and Army type games" that looked like "guy stuff" to Diaz. Diaz learned that Corey is a father and does not have custody of his own children.

–14–

Diaz did not have an address for Mother after her eviction. Diaz, who testified on September 16, 2015, later learned Mother was supposed to be in a new residence by September 11. Diaz was informed she could inspect Mother's new residence on September 13 to make sure it was safe for K.S. No one answered the door to Diaz that day, and the apartment appeared vacant through the window. Diaz spoke with the apartment manager the next day and learned Mother had not yet been approved to move in. In Diaz's opinion, Mother had not met the requirement that she maintain safe housing. After the trial recessed for the weekend on Friday September 17, Mother's attorney invited Diaz to visit the apartment. Diaz visited Mother's apartment the next morning. Mother answered the door, and Diaz went into the apartment and looked around. It was a two-bedroom apartment. There was food in apartment, but no furniture.

Just prior to trial, Diaz transported K.S. to one of his visits with Mother at the CPS office. When they arrived at the CPS office, K.S.'s pull–up diaper was wet. Diaz told Mother he needed to be changed. Mother did not change the diaper during the one–hour visit. When Diaz asked Mother why, Mother replied that K.S. did not want to be changed. Diaz testified K.S. eats whatever you put in front of him even if he had just eaten. Mother had been advised not to feed K.S. french fries, but persisted in bringing fries to K.S. during her visits with him.

Diaz observed about ten visits between Mother and K.S. over a period of several months, including the visit just prior to trial. Diaz watched the meetings from behind blinds. According to Diaz, Mother interacted with K.S. about half of the time. During the first half of the visit, Mother worked with him on lining up his ABCs. She kissed and hugged him and made him giggle. She brought him food. For the second half of the visit, "perhaps due to [K.S.] not speaking," Mother would look at her phone or do other things on her phone or put on an Elmo video for him. K.S. was smart using electronics, and Diaz observed him getting the Elmo video on his own.

–15–

Because K.S. was nonverbal, when he was placed in foster care, Diaz wanted to know how he best communicated. Mother said she and K.S. had their own language and understood each other. Diaz asked her to demonstrate the system, but Mother was not able to give a demonstration.

Diaz testified she made announced and unannounced visits to Norman's home to check on K.S. He was always well dressed and had a well-kept bedroom. Norman followed all the treatments the therapist recommended. Diaz noticed significant improvement in K.S. due to the therapies he has been receiving. K.S. follows any instructions Norman gives him. He no longer grunts. He has started to walk a little more normally.

*Brian Lockett*

Brian Lockett was Mother's CPS caseworker. He developed a family service plan for her. The plan goals included Mother's demonstration of: an understanding of and an ability to provide for the special needs of K.S.; an understanding of child development and appropriate expectations; an ability to provide basic needs and necessities such as food, clothing, shelter, medical care, and supervision for K.S.; and an ability to change the pattern of behavior that resulted in the abuse or neglect. Lockett testified Mother had not met any of these goals. The plan set out tasks and services for Mother to complete before she would be reunited with K.S. The plan required a drug and alcohol assessment, domestic violence counseling, random drug testing, parenting education, and a psychological evaluation, as well as Mother's participation and cooperation. Lockett testified that after the court ordered services for Mother, it was his responsibility to set up the services.

There was no doubt in Lockett's mind, even before K.S.'s diagnosis, that K.S. needed some sort of intervention. Fairly early in the case, Lockett suggested to Mother that K.S. might be autistic. Mother denied and minimized the situation, stating that her other children potty

trained late and she had heard of children speaking late. In December 2015, on the day K.S. was placed with Norman, Lockett had a phone conversation with both Mother and Norman. He told Mother it was very important she attend K.S.'s therapy and medical appointments. He emphasized that Mother needed to make herself knowledgeable about K.S.'s diagnosis and special needs. He told her the Department needed to know she would be able to care for K.S. permanently and to adequately meet his special needs. Mother seemed to understand what he was saying. Lockett testified that Mother had not been participating in the therapy sessions for K.S. The therapy sessions had been going on twice a week for the last eight-and- a-half months. If there were four weeks in a month, that would make 64 sessions. He believed Mother had attended fewer than five sessions. According to Lockett, Mother had none of the education, training, or understanding of what is necessary for K.S. to continue to progress with his autism. In this regard, she had not fully completed her service plan. In a phone conversation in March, Mother stated to Lockett that if the doctor's visits were not court ordered, she was not going.

Lockett provided Mother with bus passes to help her with her transportation problem. He had given her at least four passes a month over the life of the case. He had not given her enough for every appointment.

Lockett had observed visits between Mother and K.S. at CPS offices, including two shortly before trial began. At times, Mother appeared to engage her child. He observed Mother going over the alphabet with K.S. He saw K.S. sit in Mother's lap while she read to him and saw her sing to K.S. At other times, Lockett observed Mother using her cell phone during the visits and not participating with K.S.

Lockett testified that Mother completed the services CPS offered. Lockett heard Diaz testify that Mother did not complete her court services. He testified that this testimony was not true. Completion of services is an important factor CPS looks at when considering reunification.

When asked why, if Mother had done all of her services, CPS was not recommending K.S. be returned to her, Lockett stated it was due to Mother's instability and lack of ability to provide for K.S.'s special needs. Lockett testified that Mother's failure to address K.S.'s special needs had endangered his welfare. Mother's failure had slowed K.S. developmentally and emotionally.

Lockett testified that if the jury terminates Mother's rights, it is CPS's plan for Norman to adopt K.S. Lockett testified that K.S. had made huge strides since his therapy started. Before he came into care, he was using his hands to feed himself. Now he can use utensils. He can dress himself. His gait is different. He can brush his teeth.

Lockett testified that Mother had misled him or CPS. She had reported to Lockett that she and K.S. had a special sign language they used to communicate. Mother led him to believe it was a "rather elaborate form of sign language." Lockett did not observe such a sign language. Also she told Lockett that K.S. spoke a few words. Lockett never heard K.S. speak, nor to Lockett's knowledge, had anyone else involved in the case.

Lockett also testified Mother had endangered K.S. by leaving him with Father and by leaving him around Corey. Lockett testified that Mother had not obtained the medical care K.S. needs and had not learned how to take care of his special needs. He further stated it was in the best interest of K.S. to terminate Mother's and Father's rights.

During cross-examination, Mother's attorney asked Lockett about his testimony that Mother knowingly placed or allowed K.S. to remain in conditions that endangered his physical and emotional well-being. Counsel asked him to state specifically what Mother did. Lockett cited Mother's naming Father as a caregiver for K.S. at the time of her arrest and by allowing K.S. to be around Corey. When asked what evidence he had that it endangered K.S. for him to be around Father or Corey, Lockett stated he had none other than Norman's prior testimony. When asked about other evidence of Mother knowingly placing or allowing her child to remain

in conditions that endangered his well-being, Lockett cited the fact that Mother had tested positive for marijuana in July 2015. He admitted the test occurred when K.S. was not in Mother's care or custody. Counsel asked, "[W]hen you look at the mother endangering the child, in placing or allowing the child to remain in conditions or surroundings that endangered the child, you don't have any evidence to support that?" Lockett replied, "No."

*Other Evidence*

In addition to the evidence about K.S.'s medical needs and care, there was evidence regarding Mother's drug use. Mother told Doctors Gagnon and August she smoked marijuana during cancer treatment. Mother testified that she tested positive for marijuana in July 2015 and that in the past she had smoked crack cocaine with Father. She denied any current drug use. She admitted that her son Corey had sometimes smoked dope in her apartment, but said he had not done so in a year. The owner of a drug testing service testified that any chemical a person puts on her hair reduces the level of drugs present in the hair. Lockett requested a hair follicle test be performed on Mother. Due to suspicions about the chemicals Mother had been using in her hair, Lockett requested the sample be taken from hair other than that found on her head. At the time of the requested test, there was no body hair on Mother that could be used as a sample. Mother testified that since her cancer treatment, she had a problem with the growth of her body hair. A test of Mother's nail bed was then performed in July 2015. The nail bed test was positive for marijuana, indicating Mother had used marijuana in the past three to five months. Norman testified that Mother told her she changes her hair color a few times a year to beat drug tests. Mother denied using special shampoos or dyes to avoid the hair test and denied telling Norman that she had. Norman testified that the previous summer she witnessed Mother, Corey, and a few others using marijuana at Mother's apartment while K.S. was upstairs.

Also, there was evidence Father was not an appropriate placement for K.S. and evidence suggesting Mother still had some relationship with him. Lockett and Diaz testified Father is a sex offender and tested positive for cocaine during this case. A copy of a 1993 judgment revoking Father's probation for attempted sexual assault was admitted into evidence. According to Lockett, Father did not participate in any court–ordered services. Mother had alleged there was domestic violence in her relationship with Father. After Mother's arrest, CPS found Father in her apartment. Mother testified she learned from her apartment manager that Father had been coming in and out of her apartment. She denied knowing he had been doing that. Several months before trial, "[i]n March maybe," Father indicated to Lockett that he and Mother were trying to work things out. A week later, he stated they no longer had any kind of relationship. The week prior to his testimony at trial, Lockett received a text message from Father saying he wanted K.S. to come home to Mother and for CPS to "leave us alone." Father asked Lockett to "please step aside and let us have our life back." Father stated, "we understand [K.S.'s] condition, and we will make sure he gets the correct medical and mental treatment." Mother testified she and Father have no relationship other than trying to talk about the interests of K.S. She stated that if Father's rights were terminated, she would be able to protect K.S. from him.

**MOTHER'S WITNESSES**

*Rebecca Torres-West*

Rebecca Torres-West is Mother's counselor at The Family Place. CPS referred Mother to Torres-West. Torres-West began counseling Mother in January 2015. Mother indicated to Torres-West that she had been in two relationships that involved domestic violence, one with her husband several years earlier and "the current one as of 2012," who Torres-West later indicated was K.S.'s Father. The Family Place provides education about violence in relationships. Torres-West testified that Mother indicated she understood the dynamics and red flags and that she

would not tolerate violence in her life. Mother participated in both group and individual counseling. Mother was responsive to the group discussions and helpful to new members of the group. By the end of April 2015, Mother had attended five group domestic violence sessions and ten individual sessions. The Family Place provides other forms of support, including helping clients get jobs, financial classes, an emergency housing fund, and vouchers for a resale shop to help with clothing and home furnishings. Torres-West was asked in July 2015 to continue counseling Mother to address issues other than domestic violence. Since that time, Mother had about six sessions. They talked about the facts that brought K.S. into CPS custody, the shoplifting charge, the CPS services she was working on or had completed, and strategies for managing depressed moods. Torres-West testified that Mother has a lot of anxiety from time to time. She worried about getting her child back, her housing, getting a job, finishing her classes, and transportation. Mother was always responsive to their discussions.

Torres-West had not met K.S. and did not know what level of autism he had, but had discussions with Mother about him. They discussed schooling options, therapy options, and behavioral training. Torres-West recommended online videos and programs to help Mother understand autism spectrum disorder. Mother seemed receptive about wanting to learn about the disorder. When asked if she had noticed any signs Mother suffered from mental health issues, Torres-West replied, "Anxiety that I would attribute to trauma and some depression."

Torres-West and Mother also discussed the conflict with Norman. Mother told Torres-West they had disagreements about what his needs were and how he should be cared for. Mother stated she was trying her best to get to K.S.'s appointments. Mother complained she was not always notified of the appointments or was notified too late to plan transportation. Torres-West testified she believes Mother loves K.S. She stated she believed Mother would take whatever steps necessary to protect K.S. and would put his needs above hers. Torres-West testified she

believed Mother would be a good parent and did not know of any reason her parental rights should be terminated.

Torres-West acknowledged that because her therapy was based in part on Mother's self-reporting, her assessment might not be completely accurate if she had "assumed truth when something wasn't true." Torres-West testified it would be greatly important for Mother to attend K.S.'s therapy sessions, but Mother's transportation issues were horrific.

*Mother*

Mother testified that after she was evicted from her apartment on Nogales, she was homeless and lived either with girlfriends or on the streets. Mother had never lived on the streets or in a shelter with K.S. She testified she had a new apartment with a separate room for K.S. She had gotten a voucher for home furnishings from Torres-West and was having items delivered to her apartment. She had additional items in storage she was having delivered.

Initially Norman provided Mother with transportation and was doing everything she could to help Mother. After their falling out, Mother used public transportation, and it was sometimes difficult for her to get from one place to another. Public transportation was sometimes late and did not always run in certain areas, including the area in which K.S. was currently living. Mother took two buses and a train to get to visit her son at CPS. Mother testified that sometimes the bus she took to Norman's home ran only twice a day. If she learned about an appointment on the day of the appointment, it would be very difficult for her to get there on the bus.

Mother testified that she loves K.S. She has cared for him by taking him to doctor's appointments, reading to him, feeding him, and making sure he has everything he needs. Mother went over the alphabet with K.S., and he knew it when he was taken into CPS custody. She taught him how to use YouTube on her phone. When K.S. wanted something, he let her know

by grabbing her hand and pulling her or sometimes through a certain motion. She had been using episodes of Diego and Dora to show K.S. basic sign language. When she told CPS she was working with him on sign language, that is what she was talking about. She worked with K.S. on potty training and brushing his teeth. She and K.S. went to the playground and the park. Mother testified that the testimony about her spending a great deal of time on her phone during her visits with her son was untrue. She used her phone during the visits to take pictures and watch videos with K.S. She brought K.S. food when she visited him. Mother testified she brought fruit parfaits, bananas, water, and crackers. When K.S. was in her home, she never had a concern about him overeating.

When asked about the hearing test Dr. Favroth recommended for K.S., Mother testified she took him for the test in Plano on Legacy Drive in 2011 or 2012. Mother later indicated on cross-examination K.S. had been two years' old. The State asked if that test was separate from the 2014 referral she had lost. Mother replied she did not lose the referral. Dr. Favroth never gave Mother a paper with the information. When asked why the test results were not sent to Dr. Favroth, Mother stated the results could have been faxed, but there was a time when Dr. Favroth was relocating offices and it could have gotten lost. Mother also indicated there was a lot of personnel turnover at the office.

Mother testified that she was very involved with the services CPS said she and K.S. needed, until March when she began having conflicts with Norman. Norman told Mother the therapist thought Mother was a distraction and should not be present. Mother asked Lockett for the number of the therapist, but Lockett told her she could not contact them directly. She and Norman had a hard time communicating. Norman did not give Mother addresses or times of the appointments. There came a time when Mother did not feel comfortable going to Norman's home. Mother testified she would have to sit outside Norman's home for about three hours with

nothing to eat until the doctor arrived or she risked being late. Norman's daughter sent her messages that contained threats.

Mother testified she had concerns about K.S.'s development, but all she realized was wrong with him was his speech. She stated he "didn't have much problem other than the speech." K.S. said a few words and that was why Mother never looked any deeper. Mother testified that the words K.S. said were "hi," "ba" for "bye bye," "ma," and "da." Mother said Norman had heard him say those words and she was lying when she said she had not.

Mother raised her concerns to Dr. Favroth and called social security and DISD. She testified she had been in the process of calling around giving descriptions of "what her son would do that people would point out that seemed odd." Mother contacted someone at the school near her apartment to speak with someone about its special education program. Mother testified she found out about the program when she met a lady in line at Walmart who worked for DISD. Mother testified she would be able to continue the services K.S. currently receives in her home. Mother had educated herself about autism by talking to doctors, going on YouTube, and looking at a few books.

## SUFFICIENCY OF THE EVIDENCE

In her first two issues, Mother contends the evidence is legally and factually insufficient to support the jury's findings that: 1) she had knowingly placed or knowingly allowed K.S. to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; and 2) she had engaged in conduct or knowingly placed K.S. with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

### Standard of Review

Because termination of parental rights is "complete, final, irrevocable and divests for all time" the natural right existing between parents and their children, the evidence in support of

termination must be clear and convincing "before a court may involuntarily terminate a parent's rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982)); *see In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d at 502; *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). This means both legal and factual sufficiency review of a decree terminating parental rights require a reviewing court to consider all the evidence to determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination are proven. *See In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). In evaluating the evidence for legal sufficiency in a termination case, we view the evidence in the light most favorable to the finding. *Id.* at 266; *In re T.A.D.*, 397 S.W.3d 835, 839 (Tex. App.—Dallas 2013, no pet.). We "consider all the evidence, not just that which favors the verdict," and we assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.F.C.*, 96 S.W.3d at 266. We also disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency, we consider and weigh all of the evidence. *Id.*; *see also In re A.B.*, 437 S.W.3d at 503 (noting reviewing court must undertake "exacting review of the entire record with a healthy regard for the constitutional interests at stake") (quoting *In re C.H.*, 89 S.W.3d 17, 19 (Tex. 2002)). We give due deference to the decisions of the factfinder because the factfinder is the sole arbiter when assessing the credibility

and demeanor of witnesses and do not supplant the judgment with our own. *In re A.B.*, 437 S.W.3d at 503; *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). We determine, on the entire record, whether the evidence is such that a factfinder could reasonably form a firm conviction or belief about the truth of the allegations against the parent. *In re A.B.*, 437 S.W.3d at 506.

## Statutory Grounds for Termination

A trial court may terminate the parent-child relationship if the factfinder finds by clear and convincing evidence that (1) the parent committed one or more of the enumerated acts or omissions justifying termination under section 161.001(b)(1) of the Texas Family Code and (2) termination of parental rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1)(A)–(T), (b)(2) (West Supp. 2015).[2] Both elements must be established, and each required finding must be based on clear and convincing evidence. *In re A.T.*, 406 S.W.3d at 370. Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In this case, the jury found Mother had engaged in conduct proscribed by subsections (D) and (E) of section 161.001(b)(1) of the family code. That is, the jury found Mother had (1) knowingly placed or knowingly allowed K.S. to remain in conditions or surroundings which endangered his physical or emotional well-being, TEX. FAM. CODE ANN. § 161.001(b)(1)(D), or (2) engaged in conduct, or knowingly placed K.S. with persons who engaged in conduct, which endangered his physical or emotional well-being, *id.* § 161.001(b)(1)(E). Mother challenges the legal and factual sufficiency of the evidence to support these findings.

---

[2] After this suit was filed, section 161.001 was amended. The subsections relevant to this case were renumbered, but their substance was not changed. For ease of reference, we refer to the current version of the statute.

Both subsections (D) and (E) require proof of endangerment. *See id.* § 161.001(b)(1)(D), (E). "Endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health, but it is not necessary that the conduct be directed at the child or that the child actually suffer an injury. *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 509, 521–22 (Tex. App.—El Paso 2004, pet. denied) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The primary distinction between the two subsections is the source of the physical or emotional endangerment to the child. *Id.* at 522. Subsection (D) addresses the child's surroundings and environment while subsection (E) addresses parental misconduct. *Compare* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), *with id.* § 161.001(b)(1)(E).

Termination under section 161.001(b)(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. *C.B. v. Tex. Dep't of Family & Protective Servs.*, No. 08-14-00224-CV, 2014 WL 6961525, at *4 (Tex. App.—El Paso Dec. 9, 2014, pet. denied); *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.— Fort Worth 2000, pet. denied). Neglect can be just as dangerous to the well-being of a child as direct physical abuse. *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). The parent's conduct may include a parent's actions both before and after the child has been removed by the Department. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see C.B.*, 2014 WL 6961525, at *4. Termination of the parent-child relationship is not justified when the evidence shows merely that a parent's failure to provide a more desirable degree of care and support is due solely to misfortune or lack of intelligence or training and not to indifference or malice. *In re S.M.*, 389 S.W.3d 483, 493 (Tex. App.—El Paso 2012, no pet.) (citing *Clark v. Dearen*, 715 S.W.2d 364, 367 (Tex. App.— Houston [1st Dist.] 1986, no writ)).

Here, there was evidence Mother endangered K.S. by neglecting his medical needs. At four years' old, K.S. did not speak and the way he walked was abnormal. Pediatrician Dr. Partap testified that K.S. was "profoundly delayed for his age," socially, emotionally, and developmentally. His behavior was so outside the norm as to be readily apparent to laypeople. Dr. Hill diagnosed K.S. with autism spectrum disorder with accompanying language impairment. K.S. was on the more symptomatic end of the spectrum. It was difficult for Dr. Hill to determine what exactly was contributing to K.S.'s issues. It was therefore imperative he have ongoing treatment and for the diagnosis to continue to be refined. There was evidence autistic children generally have a better outcome the earlier interventions begin.

There was evidence from Norman and Lockett that Mother denied or minimized K.S.'s medical issues. Lockett thought Mother had misled CPS by overstating K.S.'s abilities. She reported that they used a rather elaborate form of sign language and that K.S. spoke a few words. Lockett and others saw evidence of neither.

Despite professing to K.S.'s pediatrician and others that she was concerned about K.S.'s lack of speech, there was evidence that for over two years Mother did nothing to seek medical treatment for him about this problem. Dr. Favroth indicated that K.S.'s speech development was an issue at a June 2012 appointment. As an initial step, Dr. Favroth recommended a hearing screening and referred Mother to an audiologist. Mother testified she took K.S. to more than one hearing screening. She testified she took him for the test in Plano in 2011 or 2012. She also testified K.S. had seen doctors at Children's Medical Center and at a location in Richardson for a screening. Mother said she had records of those visits in storage. Yet records from K.S.'s visit to Dr. Favroth's office in July 2013 show the doctor was still referring K.S. to Children's audiology for hearing testing. And in April 2014, Mother requested another referral to an audiologist from Dr. Favroth because she had lost the phone number. After her arrest in October

–28–

2014, Mother told the CPS investigator she was looking for an audiologist for K.S. It was within the jury's province to judge Mother's demeanor and disbelieve her testimony that she did in fact follow Dr. Favroth's recommendation to have K.S.'s hearing evaluated, as well as other aspects of her testimony. *See In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005).

Further, there was evidence Mother's failure to seek treatment for K.S. was more than just ignorance regarding his condition. After K.S. was diagnosed and began receiving the needed therapies, Mother continued to neglect his medical needs. Various witnesses testified about the importance of Mother attending K.S.'s therapy sessions to make herself knowledgeable about K.S.'s diagnosis and special needs and to learn how to carry out the skills and cue K.S. to engage in the techniques learned during the course of the therapies. Mother acknowledged knowing the importance of attending K.S.'s therapy sessions. Yet she herself admitted attending just three of at least sixty-four therapy sessions.

There was evidence favorable to Mother's parenting skills. She had worked with K.S. on the alphabet and showed him affection when they met. Dr. Favroth said Mother aggressively tried to help K.S. develop. Yet the doctor also stated that failing to have a child tested for developmental delays could be medical neglect. Dr. August stated Mother was committed to doing whatever she needed to do to be reunited with her son. Torres-West testified Mother loves K.S. and would be a good parent. August's and Torres-West's evaluations of Mother were based on Mother's self-reporting. We defer to the jury's resolution of the credibility issues in this case.

In arguing that the evidence is insufficient to support the jury's findings of endangerment, Mother relies in part on Lockett's statement that he did not have any evidence to support a determination that Mother endangered the child or had placed or allowed the child to remain in conditions that endangered him. This testimony occurred in the context of Mother's attorney asking Lockett about evidence that K.S. was endangered by being around Father or Corey or

–29–

through Mother's marijuana use that occurred when K.S. was in Norman's custody. On the whole of Lockett's testimony, it is clear he believed Mother endangered K.S. by failing to meet his medical and special needs. Further, Lockett was not the only witness to testify about Mother's medical neglect. On review of the entire record, we conclude a factfinder could reasonably form a firm conviction or belief that Mother engaged in conduct which endangered K.S.'s physical or emotional well-being. The evidence is legally and factually sufficient to support the jury's finding under section 161.001(b)(1)(E). We overrule Mother's second issue and need not address her first issue.

## Best Interests of the Child

In her third issue, Mother challenges the legal and factual sufficiency of the evidence supporting the jury's finding that it was in the best interest of the child to terminate the parent–child relationship. Before terminating a parent's rights, the factfinder also must find that terminating the parent's rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(2); *see also In re A.V.*, 113 S.W.3d at 362 (noting that primary focus of termination proceeding in trial court and on appeal is protecting best interest of child). In reviewing the sufficiency of the evidence to support a finding that termination is in the child's best interest, a court examines several factors, including the desires of the child; the child's current and future emotional and physical needs; any emotional or physical danger to the child; the parental abilities of the persons seeking custody and their plans for the child; the programs available to assist those persons seeking custody in promoting the best interest of the child; the stability of the home; acts or omissions by a parent tending to show the existing relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing factors used for determining best interest of child). These factors are

not exhaustive, and some of the listed factors may be inapplicable to some cases. *In re C.H.*, 89 S.W.3d at 27.

While there is a strong presumption that keeping the child with a parent is in the child's best interest, *see* TEX. FAM. CODE ANN. § 153.131(b) (West 2014), the prompt and permanent placement of the child in a safe environment also is presumed to be in the child's best interest. *Id.* § 263.307(a) (West 2014). Section 263.307(b) of the family code lists the factors to consider in determining whether the child's parents are willing and able to provide the child with a safe environment. *See* TEX. FAM. CODE ANN. § 263.307(b)(1)–(13) (West Supp. 2015). The statutory best interest factors include, among other things, the child's age and physical and mental vulnerabilities; the magnitude, frequency, and circumstances of the harm to the child; whether there is a history of abusive conduct by the child's family; the willingness and ability of the child's family to effect positive environmental and personal changes; and whether the child's family demonstrates adequate parenting skills, including providing the child and other children in the family's care with minimally adequate health and nutritional care. *Id.*

As discussed above, Mother failed to seek medical treatment for K.S.'s obvious major developmental delays, and after he was diagnosed, she failed to participate significantly in his treatment and had not learned how to take care of K.S.'s special needs. Dr. August testified Mother was comfortable with herself the way she is and did not see cause for making changes in her behavior. Dr. Hill, who diagnosed K.S.'s condition, recommended that he have increased stability and consistency regarding his home environment as well as caregivers. The doctor testified that K.S. would have a much better prognosis with a caregiver who is consistent in putting forth the effort to engage in activities and therapies with him. There was evidence Mother was unable to provide a stable home environment. She moved frequently, got evicted, and sometimes lived in shelters or with people she did not know well. CPS planned for Norman

to adopt K.S. K.S. had made great strides in her care. Norman followed all the treatments the therapists recommended for K.S. Based on our review of the record, we conclude the evidence presented at trial and summarized above is legally and factually sufficient to support the jury's findings that termination of Mother's parental rights was in K.S.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *Holley*, 544 S.W.2d at 371–72.

We affirm the trial court's decree of termination.


/Ada Brown/
ADA BROWN
JUSTICE


151294F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF K.S., A CHILD

No. 05-15-01294-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas
Trial Court Cause No. JD-14-01199-W.
Opinion delivered by Justice Brown, Justices Lang-Miers and Schenck participating.


In accordance with this Court's opinion of this date, the trial court's decree of termination is **AFFIRMED**.

It is **ORDERED** that appellee recover its costs of this appeal from appellant.


Judgment entered this 21st day of April, 2016.